United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PEDRO JOAQUIN OLIVAS

Petitioner,

v.

MIKE MARTEL, Warden,

Respondent.

Case No.  11-00499 JST (PR)

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS;
DENYING CERTIFICATE OF
APPEALABILITY; DIRECTIONS TO
CLERK**

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to

28 U.S.C. § 2254 by petitioner Pedro Joaquin Olivas, challenging the validity of a judgment

obtained against him in state court.[1]  Respondent filed an answer to the petition.[2]  Petitioner has

filed a traverse.

## I.  PROCEDURAL HISTORY

On August 16, 2007, a jury in San Mateo County Superior Court convicted petitioner of

second degree murder and assault on a child under eight years old resulting in death.  (Resp. Ex.

1B at 490-491.[3])   Petitioner was sentenced to 25 years-to-life in state prison.  (Ex. 1C at 613-615.)

On direct appeal, the California Court of Appeal affirmed the judgment on October 29, 2009, and

the California Supreme Court denied review on February 3, 2010.  (Exs. 10 & 12.)

---

[1]The matter was reassigned to this Court on February 11, 2013.  (See Docket No. 33.)

[2]The Court granted petitioner's motion to supplement his petition with additional, newly
exhausted claims.  (See Docket Nos. 16 & 18.)  Respondent's answer includes a supplemental
brief addressing the merits of the additional claims.  (See Docket No. 22.)

[3]All references herein to exhibits are to the exhibits submitted by respondent in support of the
answer.

On December 15, 2008, petitioner filed a petition for writ of mandate in the California Court of Appeal, which denied the petition on December 23, 2008.  (Ex. 13.)

On February 2, 2009, petitioner filed a petition for writ of mandate in the California Supreme Court, which transferred the matter to the California Court of Appeal on February 19, 2009, and denied by that court on March 18, 2009.  (Exs. 13-15.)

On March 2, 2009, petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, which denied the petition on March 18, 2009.  (Ex. 16.)

On June 29, 2009, petitioner filed a petition for writ of habeas corpus in the California Supreme Court, which denied the petition on December 2, 2009.  (Ex. 17.)

On October 15, 2009, petitioner filed another petition for writ of habeas corpus in the California Court of Appeal, which denied the petition on February 3, 2010.  (Ex. 18.)

On January 3, 2011, petitioner filed a petition for writ of habeas corpus in the California Supreme Court, which denied the petition on July 13, 2011.  (Ex. 19.)

Petitioner filed the instant habeas petition on February 2, 2011.

## II.  STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Court of Appeal.[4]:

*A.  Prosecution Case*

Lizbeth Esquivel lived at her sister's house with her sister's family and a second sister. In October 2002, Ms. Esquivel had a son, Fernando. When Esquivel went back to work about three months later, her sisters babysat Fernando.

Esquivel moved out of her sister's house on April 5, 2004, and into an apartment in Daly City. Shortly after midnight on April 9, 2004, Esquivel and [petitioner] brought Fernando, then 17 months old, to the Seton Medical Center in Daly City. Fernando was breathing but unconscious and unresponsive.

---

[4]This summary is presumed correct.  Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

United States District Court
Northern District of California

Dr. Mark Alderdice was on duty that night in the Seton Emergency Department. Alderdice found Fernando to be "comatose basically." He and other medical staff initiated efforts to resuscitate the child. However, Fernando died at Stanford Medical Center on April 13.

Alderdice was board certified in emergency medicine and had practiced in that capacity since 1989. He was the administrative director for the emergency departments of 10 hospitals and was responsible for oversight of 130 emergency department physicians. Alderdice helped to set standards for these departments, which included recognition and treatment of injuries associated with shaken baby syndrome.

Within minutes of their arrival at the hospital, Alderdice asked [petitioner] what had happened. [Petitioner] said that Fernando had fallen off a bed that was two to three feet high, and onto the floor. When Alderdice pressed him for details, [petitioner] explained that Fernando fell onto the carpeted floor, tried to get up, fell again, and bumped his head into a wall heater. Fernando became unresponsive so [petitioner] put him on the bed and tried to wake him. [Petitioner] denied that any other incidents had occurred that might account for the child's comatose state.

Further examination of Fernando revealed bruising on his forehead just above the nose and minor bruising on his legs. A CT scan revealed a subdural hematoma on the right side of Fernando's brain. He had retinal hemorrhages in both eyes. Fernando was also bleeding from his frenulum – the gum area underneath his upper lip. The tear to the tissue in this area appeared to be fresh and likely occurred within a matter of hours before Fernando was brought to the hospital. There was also residual blood in Fernando's throat.

The combination of the subdural hematoma with the retinal hemorrhages caused Alderdice to suspect that Fernando may have been violently shaken. The hemorrhages in Fernando's eyes were of such an extent that they were not consistent with a benign cause, including a fall from a bed, impact with a wall heater, or a fall from a high chair. Alderdice believed they were caused by a shearing force that resulted from acceleration or deceleration. He thought it was "inconceivable" that the child would have sustained the injuries he had as a result of a fall from the bed and bumping his head into a wall heater. Alderdice believed Fernando's injuries were consistent with shaken baby syndrome, in which a child is violently shaken back and forth with his head whipping back and forth multiple times. This can occur with or without blunt impact against a floor, wall, or backboard. In Fernando's case, the bruise on his forehead was indicative of impact against a broader, flat surface.

Alderdice found [petitioner]'s demeanor to be extremely unusual and striking. He seemed agitated and angry, whereas parents in that situation were typically fearful and upset over a child's injury. Alderdice repeatedly pressed [petitioner] for other possible explanations of the child's injury, and stressed that he needed the information to facilitate his treatment of Fernando, but [petitioner] denied any other trauma. Alderdice also spoke to the child's mother. Neither parent told him the child had been hurt before the alleged fall from the bed.

Daly City Police Department Detective Albert Cisneros responded to the Seton Medical Center around 2:00 a.m. on April 9, and spoke with [petitioner] and Esquivel. [Petitioner] told Cisneros that he had driven Esquivel to the BART station at around 7:00 p.m. the preceding day and that Fernando was with them. After returning to the apartment,

3

[petitioner] fed, bathed, and changed Fernando. Fernando fell asleep and [petitioner] took him to the bedroom and placed him in the center of the queen-sized bed with a pillow on either side of him. [Petitioner] left the room to call Esquivel to find out when she would be done at work because he had some personal business to conduct. [Petitioner] told Cisneros that he told Esquivel words to the effect that "he didn't want to be kept waiting, he had to take care of his business. He didn't want to do this again."

After finishing his call, [petitioner] told Cisneros he heard a "boom" and went into the bedroom. He saw Fernando "stagger[] up on his feet" and then fall forward and hit his head on the wall heater. He picked Fernando up and Fernando fainted in his arms. He called Esquivel at work. He did not know why he did not call 911. He tried to revive Fernando by placing a damp paper napkin on his face and patting his face to see if he would wake up. He took Fernando with him and went to pick up Esquivel at San Francisco International Airport where she worked.

During a break in his interview of [petitioner], Cisneros spoke with doctors at the hospital who told him Fernando's injuries were inconsistent with [petitioner]'s explanation of what happened. When Cisneros confronted [petitioner] about the inconsistencies, [petitioner] repeated the account he had already given, and repeated that account again when he was interviewed at the police station after being read his rights under *Miranda v. Arizona* (1966) 384 U.S. 436.  [Petitioner] told Cisneros that the injuries Fernando sustained probably occurred when the child was in the care of Esquivel's sisters. [Petitioner] claimed to have seen bruises and marks on Fernando when he was in the sisters' care and described that as an ongoing issue.

After [petitioner] was indicted and advised that the charges included murder, Cisneros interviewed him a third time on June 5, 2005. [Petitioner] initially repeated his earlier account. When Cisneros told him that the crime lab found blood on Fernando's clothing, [petitioner] told him for the first time that Fernando had fallen from the couch earlier in the evening with a baby bottle in his mouth. [Petitioner] did not give a coherent answer when asked to explain why he had not mentioned the couch fall earlier. He reiterated in the third interview that he had not been happy about how long he had to babysit for Fernando that evening, that this caused problems between him and Esquivel, and that he was considering ending his relationship with her. He also reiterated his claim that Esquivel's family members were responsible for Fernando's injuries.

Detective Joseph Bocci of the Daly City Police Department took photos of Fernando at the Stanford Medical Center. He observed "at least one dozen" bruises on Fernando, most of which were on his head "running parallel with the eyebrow line along the bridge of the nose over to the other opposite side of the temple." He also saw "faint bruising" at the "lower jaw line area." Bocci also noticed a reddish circular mark, about the size of a 50-cent piece, in the middle of Fernando's chest.

Criminalist Linda French processed the crime scene at Esquivel's apartment on the morning of April 9. The bed was two feet two inches in height and was located four feet away from the water heater. French observed stains on a pillowcase and on the top sheet of the bed that were later determined to be blood. French closely examined the wall heater. She saw no sign of impact on the heater and found no blood on it. French was trained to detect patterns in dust. She found an even layer of undisturbed dust on the heater that

4

would have been displaced if someone struck the heater. It was unlikely the dust had accumulated recently. French opined that the heater was not disturbed within the previous nine hours or the night before. The floor was covered with a standard brown wool carpet over foam padding.

Esquivel's sisters testified that Fernando did not have any bumps, bruises, broken bones or other injuries when he and his mother moved out on April 5, 2004. He never had any serious injuries when he lived with them.

Forensic pathologist Thomas Rogers performed Fernando's autopsy. Rogers opined that Fernando died from "multiple blunt injuries," consistent with being beaten to death. He found 19 bruises on Fernando's head and neck, and 11 bruises on his arms and legs. The appearance of the bruises at the time of autopsy was consistent with the bruises having been inflicted between 7:00 p.m. on April 8 and 1:00 a.m. on April 9. Rogers observed a "great disruption" to Fernando's frenulum and opined that such an injury was indicative of a battered child. In Roger's opinion, Fernando's injuries were inconsistent with having been caused by a fall off a bed, landing on a carpet, and then hitting his head against a wall heater. It was significant that Fernando sustained blunt injuries over a wide area of his body.

Neuropathologist Hannes Vogel examined Fernando's brain. He observed a subdural hematoma under the covering, or dura, on the right side, which he estimated occurred within two to four days of Fernando's death on April 13. Vogel opined that the subdural hematoma was a result of the infliction of traumatic injury. Vogel's examination suggested there may have been some injury to Fernando's spinal cord, as well. He believed there was "no chance whatsoever" that Fernando's injuries occurred as a result of a fall from a bed that was two feet off the floor. He was also "[a] hundred percent" confident that Fernando's injuries could not have been caused by an earlier fall from a high chair. Vogel observed multiple severe hemorrhages in front of and behind Fernando's retinas. In Vogel's opinion, the hemorrhages were indicative of a blunt force trauma. Based on his examination, Vogel testified that although he could not exclude a severe car accident or fall from a high building as possible causes of Fernando's injuries, it would be a "stretch" to attribute injuries of such severity even to a fall from a two story building or a car accident without restraints at 30 to 40 miles per hour.

Doctor Peter Egbert of the opthalmic pathology laboratory at Stanford Medical Center examined Fernando's eyes, and concluded that the pattern of injuries he observed "occurs exclusively... in abusive injuries." In Egbert's opinion, no explanation other than child abuse accounted for Fernando's retinal hemorrhages.

Forensic DNA analysis revealed that Fernando's blood was on a baby jumper located on the dresser, a baby pajama top found on the shower curtain rod, as well as the pillowcase and top sheet taken from the bed. Fernando's blood was also found on the T-shirt [petitioner] was wearing on the night of the incident, along with [petitioner]'s own blood. Another stain on [petitioner]'s T-shirt was found to contain a mixture of Fernando's and [petitioner]'s blood.

///

United States District Court
Northern District of California

B.  *Defense Case*

The defense rested without introducing any evidence. In his closing argument to the jury, defense counsel maintained [petitioner]'s statements to the police about the circumstances of Fernando's injuries were consistent and true, and urged the jury to find that the prosecution failed to prove [petitioner]'s guilt beyond a reasonable doubt.

People v. Olivas, No. A120088, slip op. at 1-7 (Cal. Ct. App. Oct. 29, 2009).

**III.  DISCUSSION**

A.     Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict."  Penry v. Johnson, 532 U.S. 782, 795 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  Williams, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.

United States District Court
Northern District of California

6

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous."  Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Here, as noted, the California Supreme Court summarily denied petitioner's petition for review.  (Ex. 12.)  The Court of Appeal, in its opinion on direct review, addressed three of the claims petitioner raises in the instant petition.  (See Ex. 10.)  The Court of Appeal thus was the highest court to have reviewed those claims in a reasoned decision, and, as to those claims, it is the Court of Appeal's decision that this Court reviews herein.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  As for the claims for which there is no reasoned opinion available, the United States Supreme Court has clarified that the absence of reasoning does not prevent application of the standard of review set forth in § 2254(d).  See Harrington v. Richter, 131 S. Ct. 770, 784 (2011) ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.")

B.    Petitioner's Claims

Petitioner asserts the following grounds for relief: (1) the prosecution's exercise of peremptory challenges based on race violated petitioner's rights under the Sixth and Fourteenth Amendments; (2) the trial court's failure to instruct the jury on a lesser-included offense violated petitioner's rights under the Fifth, Sixth and Fourteenth Amendments; (3) he received ineffective assistance of counsel for numerous failures in violation of his Sixth and Fourteenth Amendment rights; (4) the prosecutor violated petitioner's Sixth and Fourteenth Amendment rights by

withholding evidence; (5) the prosecutor committed misconduct in handling evidence of the infant victim's prior head injuries; and (6) the prosecutor committed misconduct by intimidating a defense witness.[5]  The Court addresses each claim in turn.

    1.    <u>Peremptory Challenges (Claim 1)</u>

Petitioner's first claim is that the trial court erred when it failed to find a prima facie showing of racial discrimination in the prosecutor's use of peremptory challenges to exclude four Hispanic prospective jurors, which violated his rights under the Sixth and Fourteenth Amendments.

The Court of Appeal summarized what occurred at trial with respect to this claim:

A.    Batson/Wheeler *Motion*

1. *Facts*

From the prospective jurors available to sit on the jury, the prosecutor struck two with Hispanic surnames – N.R. and A.O. He then struck two more Hispanic jurors – M.S. and M.E. – from the prospective jurors available to sit as alternates. [Petitioner] objected to the prosecutor's asserted discriminatory striking of Hispanic jurors pursuant to *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*). [FN2] At the time of the motion, two of the 12 seated jurors were Hispanics.

    FN2. *Batson* held that the use of peremptory challenges by a prosecutor to strike prospective jurors on the basis of group membership violates, inter alia, the defendant's right to equal protections of the laws under the Fourteenth Amendment to the United States Constitution. (*People v. Gray* (2005) 37 Cal.4th 168, 183-184.) *Wheeler* had previously held that such a practice violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. (*People v. Gray*, at pp. 183-184.)

In response to the defense motion, the trial court found, "based upon the entirety of the jury selection process and the fact that [the prosecutor] accepted the panel as constituted a number of times, which included a number of individuals with Hispanic surnames," that defense counsel had failed to state a prima facie case of discrimination. Nevertheless, the court permitted the prosecutor to state his reasons for striking the four Hispanic prospective jurors, after which the court reiterated its finding of no prima facie case of racial discrimination and denied the *Batson* motion.

---

[5]Claims 5 and 6, along with additional ineffective assistance of counsel claims, were the newly exhausted claims which the Court permitted petitioner to add to this action with a supplemental pleading.  (<u>See</u> Docket No. 18.)

United States District Court<br>Northern District of California

*a. N.R.*

N.R. was a 34-year-old female resident of Redwood City. She was married with three children and worked part-time doing office managerial work for her husband's building maintenance business. She had worked for 10 years as a medical assistant for several medical professionals. Her experiences with those individuals were "mostly positive" and she believed medical professionals "mostly want to help." Her sister-in-law had worked as a community service officer. Her brother had been sexually abused by family members when he was a child, and she had been held up while working as a teller. She answered "No" on her jury questionnaire when asked whether she would "automatically believe the testimony of a doctor simply because he or she is a doctor." In response to the follow-up prompt, "If 'yes' please explain," she added, "I would definitely look at the evidence and hear the other side of the story."

At the outset of his juror voir dire, the prosecutor told the jurors that he would mainly be asking them two questions – whether they could be fair jurors and whether they had any knowledge of Spanish. The prosecutor explained that when he asked them if they could be fair jurors he was expecting them to let him know if there was anything in their background they believed would substantially interfere with their ability to be fair to both sides. He also stated that he would be asking those who had any background in Spanish whether it would be difficult for them to rely on the translator's English translation instead of a Spanish-speaking witness's testimony.

He asked N.R. only the two questions she emphasized in his preliminary statement: whether she could be a fair juror and whether, due to her knowledge of Spanish, she could focus on the English translation when a witness was testifying in Spanish. She answered both questions affirmatively.

In explaining why he challenged N.R. (with his sixth peremptory challenge), the prosecutor stated that she "wasn't a bad juror but because of the dynamics of jury selection, I thought I could get a better one." He explained: "She was the one that took some pain to point out in her jury questionnaire, you know, I want to hear both sides of the story, and while that is, of course, what you should be doing, she seemed to want to emphasize that to the extent where I suspect that there could conceivably be a defense bias there, and I simply wasn't willing to take a chance with the jury dynamics the way it is."

*b. A.O.*

A.O. was a 20-year-old female resident of Daly City. She was single with one child, lived with her mother, and worked full-time as a medical assistant. She had gone to college for two years. Either A.O. or a family member of friend had been a witness to or victim of domestic violence.

In explaining his peremptory challenge of A.O., the prosecutor stated that she "acted or appeared very young to [him]." He stated that she was only 20 years old and seemed "quite young" in both appearance and demeanor. He also pointed to two responses on her questionnaire (1) to the question of whether she had formed any expectations about child abuse cases from reading or watching television, she responded, "No, you must hear all evidence first for outcomes to be just"; and (2) when asked whether crimes involving child

abuse should be treated differently from other crimes, she responded that it "depends on who is committing them, another child or minor or an adult." The prosecutor commented as followed on these responses: "I'm not sure… that that portrays [a] focus that… I would want to keep on the jury. She just seemed very young." During voir dire, the prosecutor asked A.O. only whether she could be fair and whether as a medical assistant she had worked on a child abuse case. She stated she had not worked on such a case.

### c. M.S.

During the selection of the four alternate jurors, the prosecution exercised its first two peremptory challenges against two Hispanic-surnamed jurors, M.S. and M.E. M.S. was a female, born in El Salvador. She was 32 years old, married with four children, a resident of East Palo Alto, and the food manager at a Costco Wholesale store.

The prosecutor asked M.S. two questions during voir dire – whether she could be a fair juror (she replied "yes") and whether she could think of anything that would prevent her from being fair (she answered "No").

The prosecutor stated his reason for striking M.S. was that she appeared "quiet and diffident compared to the other jurors," and "younger than her age of 32." The prosecutor stated he was concerned she might feel "cornered or pushed around," especially in view of the jury's gender breakdown of nine men and three women. He offered to show the court that he had tagged both her and M.E. as negative on their questionnaires.

### d. M.E.

M.E. was a male, born in Honduras, a resident of San Mateo, married with four children, and retired. His oldest child was 38 years old. One of his sons was a private investigator. One daughter was a forensic psychologist, and another daughter was a social worker.

During voir dire, the prosecutor asked M.E. whether he could be a fair juror, whether he spoke with his psychologist daughter about her cases, and whether she testifies in court. He replied that he could be fair, and that he does not speak with his daughter about her cases and she does not testify in court.

The prosecutor explained that he excused M.E. because his daughter's work as a forensic psychologist sounded like defense work. He also believed that at least two of M.E.'s children "were involved in the sort of thing that would cause him to have a liberal view of crime and criminality."

People v. Olivas, slip op. at 7-10.

The state appellate court then identified the applicable law and rejected petitioner's claim:

### 2. Applicable Law

Our Supreme Court spelled out the procedures to be followed in deciding a *Batson/Wheeler* motion as follows: "There is a rebuttable presumption that a peremptory

challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination. [Citations.] To do so, a defendant must first 'make out a prima facie case "by showing that the totality of the relevant facts give rise to an inference of discriminatory purpose." [Citation.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial… exclusion" by offering permissible race-neutral… justifications for the strikes. [Citations.] Third, "[i]f a race-neutral… justification is tendered, the trial court must then decide… whether the opponent of the strike has proved purposeful… discrimination." [Citation.]' [Citation.] The same three-step procedure applies to state constitutional claims. [Citation.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 341.)

In determining whether the defendant ultimately has carried his burden of proving purposeful racial discrimination, implausible reasons or reasons contradicted by the record may be found to be pretexts for purposeful discrimination. (*McClain v. Prunty* (9th Cir. 2000) 217 F.3d 1209, 1221-1222; *Caldwell v. Maloney* (1st Cir. 1998) 159 F.3d 639, 651.) However, the justification offered need not be sufficient to support a challenge for cause, and even "'trivial'" or "'highly speculative'" reasons, if genuine and neutral, will suffice. (*People v. Arias* (1996) 13 Cal.4th 92, 136; *People v. Ervin* (2000) 22 Cal.4th 48, 77.) "A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons. [Citations.]" (*People v. Lenix* (2008) 44 Cal.4th 602, 613.)

### 3. *Analysis*

[Petitioner] asserts the following factors supported his prima facie case of discrimination: (1) at the time of the motion, the prosecutor had excused four of the six Hispanics then available on the panel; (2) other than their membership in the identified group, the excluded prospective jurors were heterogeneous; (3) the prosecutor's voir dire of the excluded jurors was desultory; and (4) the [petitioner] was a member of the excluded group.

We will assume, without deciding, that factors (1) and (4) are sufficient to support an inference of discrimination. [FN3] (Cf. *Fernandez v. Roe* (9th Cir. 2002) 286 F.3d 1073, and cases cited therein.) Nonetheless, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." (*Purkett v. Elem* (1995) 514 U.S. 765, 768; *Batson, supra*, 476 U.S. at p. 93.) Here, in light of the prosecutor's explanations of his peremptory challenges, [petitioner] failed to meet that burden, even taking into account the comparative juror analysis that he offers for the first time on appeal.

### a. *Proffered Reasons*

The prosecutor expressed similar concerns about two of the prospective jurors – A.O. and M.S. – that they seemed young and immature. In M.S.'s case, he added that he considered her to be quiet and diffident compared to the other jurors and expressed particular concern that she might feel intimidated during deliberations on a predominately male jury. We find nothing in the record to contradict the reasons proffered by the prosecutor. A.O. was 20 years old, single, and lived with her mother. It would not be particularly surprising or counterintuitive that she came across to the prosecutor as being relatively immature.

11

Although M.S. was 32 years old, this is not inconsistent with the prosecutor's stated concerns about her, that she seemed young and diffident. It is noteworthy that M.S.'s questionnaire and oral voir dire responses were extremely terse, which is consistent with the prosecutor's impression that she might feel insecure or intimidated by the proceedings. Most importantly, [petitioner's] trial counsel, who was in the best position to challenge the prosecutor's stated impressions of A.O. and M.S. if they were off base, made no rejoinder when invited to respond to the prosecutor's comments, and the trial court, which was in an equally good position to question the prosecutor's impressions, accepted his characterization of these prospective jurors without comment.

> FN3. The sample size was too small to conclude that the excluded jurors reflected a true cross-section of Hispanics. The prosecutor's oral voir dire of the excluded Hispanic prospective jurors was not more cursory than his voir dire of the non-Hispanic jurors he excused.

It is hard to quarrel with the prosecutor's stated reason for excusing M.E. – fear that he might have a liberal view of crime and criminality due to his children's employment. It is no surprise that a prosecutor might want to eliminate a juror who harbored liberal views on criminality. Attempting to predict a parent's views on criminality from his children's job titles may seem arbitrary or speculative – but it is not atypical of the kind of guesswork that jury selection inevitably involves. That family members' views may correlate is presumably the reason jury questionnaires not infrequently request information about other family members. Unlike challenges for cause, peremptory challenges are permitted to be based on just such hunches. We find nothing in the prosecutor's stated reasons for excusing M.E. to support the defense claim of discriminatory motive.

The prosecutor's reason for excusing N.R. is ostensibly the hardest of his reasons to understand. Based on a jury questionnaire response that she would "definitely look at the evidence and hear the other side of the story" when it came to believing the testimony of a doctor, the prosecutor felt there was a risk N.R. might be unduly skeptical of doctors' testimony. That explanation gains credibility in light of the record as a whole. First, the testimony of doctors was the linchpin of the prosecution's case, so any doubt the prosecutor had about N.R. along these lines would have to be taken very seriously. Second, N.R. did go out of her way to stress that she would not automatically believe a doctor's testimony. She volunteered the quoted statement even though the questionnaire did not call for a written explanation of her answer, and she again emphasized her objectivity about doctors when questioned by defense counsel in voir dire by answering, "No, no, definitely not," when asked if she would give additional credibility or weight to a doctor's testimony. Third, N.R. had left the medical field after several years and reported in her questionnaire that her experiences with medical professionals had been "mostly" positive and that doctors "mostly" wanted to help, leaving open the possibility that she had also had negative experiences with doctors. Finally, as the prosecutor acknowledged, he thought N.R. was an acceptable juror and kept her on the panel for some time before excusing her. It would therefore not be surprising that his reasons for excusing her might be harder to articulate or more subjective than his reasons for excluding the other jurors. But based on the record as a whole, we cannot say that his proffered reasons were insincere. (See *People v. Reynoso* (2003) 31 Cal.4th 903, 924 ["[t]he proper focus of a *Batson/Wheeler* inquiry… is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on [their] objective *reasonableness*"].)

Although by no means conclusive in the absence of credible explanations for his use of peremptories against the four Hispanic prospective jurors in issue, other factors also tend to bolster the prosecutor's claims of good faith and lack of motivation to discriminate. First, the prosecutor did not excuse his first Hispanic juror until *after* he had offered four times to accept prospective jurors that included three Hispanic members, and he used five peremptory challenges to excuse non-Hispanic jurors before excusing his first Hispanic juror from the sworn jury. This does not show a prosecutor who seemed particularly anxious to remove Hispanics from the jury. "While the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection." (*People v. Turner* (1994) 8 Cal.4th 137, 168, overruled on different grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.) Second, although the four excluded jurors were of the same race as the [petitioner], they were also of the same race as the infant victim, and all had children. The race and age of the victim reduce the likelihood that the prosecutor excused these jurors out of concern they would be sympathetic to the [petitioner] because he was Hispanic. (See *Wheeler*, *supra*, 22 Cal.3d at p. 281; *People v. Ortega* (1984) 156 Cal.App.3d 63, 70.)

People v. Olivas, slip op. at11-14.

The Equal Protection Clause forbids the exclusion of jurors by peremptory challenge solely on account of their race.  Batson v. Kentucky, 476 U.S. 79, 89 (1986).  Batson permits prompt rulings on objections to peremptory challenges under a three-step process.  First, the defendant must make out a prima facie case that the prosecutor exercised peremptory challenges on the basis of race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  Id. at 93-94.  If the defendant makes this showing, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question.  Id. at 97. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.  Id. at 98.  "To fulfill its duty, the court must evaluate the prosecutor's proffered reasons and credibility under the totality of the relevant facts, using all the available tools including its own observations and the assistance of counsel."  Mitleider v. Hall, 391 F.3d 1039, 1047 (9th Cir. 2004); Lewis v. Lewis, 321 F.3d 824, 831 (9th Cir. 2003).

The findings of the state trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review.  See Purkett, 514 U.S. at 769. So are the findings of the state appellate court.  See Mitleider, 391 F.3d at 1050; Williams v. Rhoades, 354 F.3d 1101, 1108 (9th Cir. 2004).  This means that where a challenge to the state

United States District Court
Northern District of California

United States District Court
Northern District of California

1    court's factual determination is based on extrinsic evidence or evidence presented for the first time

2    in federal court, under 28 U.S.C. § 2254(e)(1) the state court's findings of discriminatory intent

3    are presumed sound unless the petitioner rebuts the presumption by clear and convincing evidence.

4    <u>Kesser v. Cambra</u>, 465 F.3d 351, 368 n.1 (9th Cir. 2006).  Additionally, where review of the state

5    court's factual determination is based entirely on information that was contained in the state court

6    record, under 28 U.S.C. § 2254(d)(2) the federal court must defer to the state court's conclusion

7    that there was no discrimination unless that finding was "'based on an unreasonable determination

8    of the facts in light of the evidence presented in the State court proceeding.'"  <u>Cook v. Lamarque</u>,

9    593 F.3d 810, 816 (9th Cir. 2010) (citing 28 U.S.C. § 2254(d)(2)) (even though prosecutor gave

10   both persuasive and unpersuasive justifications for strikes, court could not conclude state court's

11   finding of no discrimination was objectively unreasonable where review of voir dire transcript and

12   juror questionnaires showed the most significant justifications in each case were entirely sound);

13   <u>Kesser</u>, 465 F.3d at 368 (finding  California Court of Appeal's conclusion that a strike was not

14   racially based was unreasonable determination under 28 U.S.C. § 2254(d)(2), and "even satisfies

15   the more demanding standard" of § 2254(e)(1)).  Therefore, a federal habeas court can only grant

16   habeas relief "if it was unreasonable to credit the prosecutor's race-neutral explanations for the

17   <u>Batson</u> challenge." <u>Rice v. Collins</u>, 546 U.S. 333, 338 (2006).

18        Here, the state appellate court's findings that the prosecutor's proffered reasons were race-

19   neutral and without discriminatory purpose are presumed correct.[6]  The prosecutor's reasons for

20   excusing jurors A.O. and M.S. were that they seemed young and immature, and that it was

21   possible that they would feel intimidated by the proceedings and a predominately male jury.  <u>See</u>

22   <u>supra</u> at 11-12.  In excusing juror M.E., the prosecutor expressed concern that M.E. might have a

23   liberal view of crime and criminality based on his children's employment.  <u>Id.</u> at 12.  Lastly, the

24

25   ───────────────

     [6]Because the state appellate court assumed, without deciding, that petitioner had stated sufficient

26   facts to support an inference of discrimination, this Court need not dwell on the first step of the

     <u>Batson</u> analysis.  "Once a prosecutor has offered a race-neutral explanation for the peremptory

27   challenges and the trial court has ruled on the ultimate question of intentional discrimination, the

     preliminary issue of whether the defendant has made a prima facie showing becomes moot."

28   <u>Hernandez v. New York</u>, 500 U.S. 352, 359 (1991).

prosecutor believed that juror N.R. might be unduly skeptical of doctors' testimonies based on her

oral responses and statements in her questionnaire, and because doctors' testimonies was the crux

of the prosecutor's case, he had every reason to be concerned about her objectivity in that regard.

Id.  Furthermore, the state appellate court considered the "totality of the relevant facts" in finding

that the prosecutor lacked discriminatory motive, which included the following: the prosecutor

"did not excuse his first Hispanic juror until *after* he had offered four times to accept prospective

jurors that included three Hispanic members"; the prosecutor used five peremptory challenges to

excuse non-Hispanic jurors before excusing his first Hispanic juror from the sworn jury"; and the

excused jurors were the same ethnicity as the infant victim and all had children, which reduces the

likelihood that the prosecutor excused them out of concern they would be sympathetic to

petitioner because he was Hispanic.  Id. at 12-13.  The state court's findings were not an

unreasonable determination of the facts in light of the evidence presented.  Cook v. Lamarque, 593

F.3d at 816.  Petitioner has failed to show that the state court was unreasonable to credit the

prosecutor's race-neutral explanations.

The state appellate court also considered petitioner's argument that the prosecutor's stated

reasons for excusing the four prospective jurors were not credible based on a comparative analysis

of the non-Hispanics left on the jury.  One of the main ways that a court could consider a

petitioner's Batson claim in light of the "totality of the relevant facts" is by assessing "all relevant

circumstances" surrounding the challenged peremptory strike and engaging in comparative juror

analysis.  Boyd v. Newland, 467 F.3d 1139, 1147-48 (9th Cir. 2006) (citing Batson, 476 U.S. at

96).[7]  Comparative juror analysis -- i.e., determining whether non-challenged jurors possess any of

the characteristics on which the prosecution challenged jurors in the protected group -- may tend

to prove discrimination at the third Batson step.  Snyder v. Louisiana, 552 U.S. at 484-85 (2008);

Miller-El v. Dretke, 545 U.S. 231, 242-43 (2005)[8]; Kesser, 465 F.3d at 360; Sims v. Brown, 425

---

[7]A court could also look at percentages.  Boyd, 467 F.3d at 1147.

[8]"[T]he principles expounded in Miller-El were clearly established Supreme Court law for
AEDPA purposes at least by the time of the last reasoned state court decision in Miller-El, handed
down in 1992[.]"  Kesser, 465 F.3d at 360.

United States District Court
Northern District of California

1   F.3d 560, 577 (9th Cir.), amended, 430 F.3d 1220 (9th Cir. 2005); United States v. You, 382 F.3d

2   958, 968-69 (9th Cir. 2004).   This comparative analysis may include the jury voir dire and the

3   jury questionnaires of all venire members, not just those venire members stricken.  Green v.

4   Lamarque, 532 F.3d 1028, 1030 (9th Cir. 2008) (citations omitted).[9]

5       Petitioner argued that the non-Hispanic jurors had some of the same characteristics as

6   those cited by the prosecutor as reasons for excusing the Hispanic prospective jurors at issue.  The

7   state court considered the claim on the merits and rejected it.

8       … Although we will address [petitioner's] comparative juror analysis on the merits, we
9       note that he failed to offer any such arguments in the trial court. We are thus left to
        speculate on a cold record as to what legitimate grounds, if any, the prosecutor might have
10      perceived for distinguishing among these assertedly similar prospective jurors.

11      We approach such a review with caution: "[C]omparative juror analysis on a cold appellate
        record has inherent limitations. [Citation.]… There is more to human communication than
12      mere linguistic content…. Myriad subtle nuances may shape it, including attitude,
        attention, interest, body language, facial expression and eye contact…. [¶]… When a
13      comparative juror analysis is undertaken for the first time on appeal, the prosecutor is
        never given the opportunity to explain the differences he perceived in jurors who
14      seemingly gave similar answers. [¶] Moreover, the selection of a jury is a fluid process,
        with challenges for cause and peremptory strikes continually changing the composition of
15      the jury before it is finally empanelled…. '[T]he particular combination or mix of jurors
        which a lawyer seeks may, and often does, change as certain jurors are removed or seated
16      in the jury box. It may be acceptable, for example, to have one juror with a particular point
        of view but unacceptable to have more than one with that view….' [Citation.] [¶]… Each
17      juror becomes, to a certain degree, a risk taken. Voir dire is a process of risk assessment….
        Two panelists might give a similar answer on a given point. Yet the risk posed by one
18      panelist might be offset by other answers, behavior, attitudes or experiences that make one
        juror, on balance, more or less desirable. These realities, and the complexity of human
19      nature, make a formulaic comparison of isolated responses an exceptionally poor medium
        to overturn a trial court's factual finding." (People v. Lenix, supra, 44 Cal.4th at pp. 622-
20      624.)

21
22      At the outset we reject [petitioner's] assertion that because the prosecutor accepted two
23      jurors who were 26 and 27 years old, his stated concerns about the immaturity and

24   _____

25   [9] See also Crittenden v. Ayers, 620 F.3d 962, 974-75 (9th Cir. 2010) (finding that a black
     defendant had made a prima facie showing after a comparative juror analysis between an African-
26   American prospective juror who was removed based on prosecutor's use of a peremptory
     challenge and her replacement who was a white woman showed that although they were
27   demographically similar, apart from their race, and they both expressed general opposition to the
     death penalty and hesitancy about its imposition during voir dire, the prosecutor gave them widely
28   different ratings in his notes as desirable jurors which is sufficient to raise the inference of racial
     motivation).

diffidence of rejected jurors A.O. and especially M.S. must have been pretextual. A person's maturity and assertiveness are not rigidly determined by his or her chronological age. It is entirely possible for a 20-year-old to be less mature than a 26-year-old and for a 32-year-old to be less mature or assertive than a 27-year-old. We will not overturn the presumption that the prosecutor did not engage in purposeful discrimination based on an assumption in defiance of common sense that maturity can be equated with age. Further, [petitioner] finds A.O.'s statement that "you must hear all the evidence first for outcomes to be just" in child abuse cases, to be indistinguishable from Juror No. 10's comment that he would not have any other expectation in a child abuse case than "just to hear the facts of the case." But there would have been multiple race-neutral reasons for the prosecutor to prefer having Juror No. 10 on the jury compared to A.O. Juror No. 10 stated on his jury questionnaire that crimes involving child abuse should be treated differently than other crimes in that "[p]enalties for conviction should be harder." Juror No. 10 was 44 years old, male, had three children, and held significant project management responsibilities for his employer. He was not comparable to A.O. as a potential juror in any significant respect.

With respect to N.R., [petitioner] calls attention to two jurors, Juror Nos. 6 and 10, who also indicated on their questionnaires that they would be objective about medical testimony, and a third juror, Juror No. 2, who stated in oral voir dire that he would not assign extra credibility to the hospital's physicians but would "wait and hear" their testimony. But Juror No. 10's views on child abuse would have made him especially appealing to the prosecutor even if he did take a neutral stance on medical testimony. In addition, unlike N.R., Juror No. 6 responded "Yes" when asked if she would automatically believe the testimony of a doctor and then proceeded to qualify her answer. Juror No. 6 stated that it would depend on the doctor's training. Juror No. 10 stated he would not necessarily believe "everything" the doctor says. Also, unlike N.R., neither Juror No. 6 nor Juror No. 10 reported having left the medical field after working closely with medical professionals, or gave answers otherwise raising a red flag that he or she potentially harbored negative views of doctors. Juror No. 2 could well have had a superior appeal for the prosecution compared to N.R. because of his scientific education and employment, which might have better equipped him to follow the medical testimony. He had a Ph.D. in applied physics and worked as an engineer for a medical device company. That Juror No. 2's wife was a nurse at one of the hospitals where Fernando was treated might also have added to his appeal. For these reasons, and in light of our discussion earlier of the unique factors pertinent to N.R.'s exclusion, the [petitioner's] proposed comparisons do not persuade us that the prosecutor excused her because she is Hispanic.

Finally, [petitioner] points out that while the prosecutor maintained he struck M.E. in part because M.E.'s daughter was a social worker, which might cause him to have a liberal view of crime, the prosecutor accepted two non-Hispanic jurors who might well have been excused for similar reasons. Juror No. 8's mother-in-law was a social worker and Juror No. 11 had himself been a social services caseworker in the past. However, Juror No. 8's mother-in-law was a social worker in Oklahoma, which is not a state known for its liberal view of crime. Juror No. 8's own background and profession seemed conservative in nature. He was born in Pasadena, California, attended a Catholic university, and worked in the risk management department of a large corporation. Most significantly, Juror No. 8 had three young children and – much like Juror No. 10 – responded in his jury questionnaire that crimes involving children should be treated differently from other crimes and added that "crimes against children cannot be tolerated – punishment should be appropriate."

1

> Unlike M.E., Juror No. 11 did not have two and possibly three family members who worked in areas that might cause them to have liberal views of crime. The social service agency Juror No. 11 had formerly worked for was a non-profit involved in providing child care and parenting services. If anything, this experience might have predisposed him to a pro-prosecution view in this case. In addition, two of Juror No. 11's nephews had been victims of child abuse, he expressed a positive view of doctors, and he had close friends who were doctors and nurses – all favorable characteristics for the prosecution. Again, [petitioner's] proposed comparisons do little to demonstrate prosecutorial bias against Hispanic jurors.

People v. Olivas, slip op. at 24-26.

Petitioner's claim that the prosecutor had discriminatory motives for excusing the four prospective Hispanic jurors at issue based on comparative juror analysis is without merit.  Because the state appellate court's factual findings are entitled to a presumption of correctness, see Purkett, 514 U.S. at 769, petitioner may only succeed on this claim if he rebuts the presumption by clear and convincing evidence.  Kesser, 465 F.3d at 368.  Furthermore, we must defer to the state court's conclusion that there was no discrimination unless that finding was "'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  Cook v. Lamarque, 593 F.3d at 816.  The state appellate court carefully reviewed the record of voir dire in considering each of petitioner's points.  The court's initial dismissal of petitioner's claim that the age of A.O. and M.S. was comparable to jurors remaining on the jury and therefore the prosecutor's rejection of them based on immaturity was pretextual was not unreasonable.  As the court pointed out, "[a] person's maturity and assertiveness are not rigidly determined by his or her chronological age," and it reasonably rejected the notion that "maturity can be equated with age."  See supra at 16.  The facts also support the court's conclusion that Juror No. 10 was "not comparable to A.O. as a potential juror in any significant respect" because he was 44 years old, male, had three children, and held significant project management responsibilities for his employer.  See supra at 17.  The state appellate court's conclusion that rejected juror N.R. was distinguishable from Juror Nos. 6, 10 and 2 is also supported by the record as there were race-neutral reasons which could have made these jurors more appealing to the prosecutor.  Id.  There were also race-neutral reasons for why the prosecutor kept Juror Nos. 8 and 11, whom petitioner compared to rejected juror M.E.  Despite the fact that these jurors also had connections to social

United States District Court
Northern District of California

18

services like M.E., they had other more favorable characteristics to the prosecution which would explain why he chose to keep them on the jury, including a conservative background and close friends who were doctors and nurses.  Id. at 17-18.  Against these findings based on a thorough review of the voir dire record, petitioner has failed to show that the state appellate court's conclusion was incorrect by clear and convincing evidence.  Kesser, 465 F.3d at 368.  Petitioner has failed to carry his burden of proving purposeful discrimination.  Batson, 476 U.S. at 97.  The state courts' rejection of this claim was not based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d)(2).  Accordingly, petitioner is not entitled to habeas relief on this claim.

### 2.    Improper Jury Instruction (Claim 2)

Petitioner claims the trial court violated his Fifth, Sixth and Fourteenth Amendment rights by refusing to instruct the jury on the lesser included offense of involuntary manslaughter.

The California Court of Appeal rejected this claim:

Following an off-the-record discussion with the parties about jury instructions, defense counsel stated for the record that he had requested the court to instruct on the lesser included offense of voluntary manslaughter. The court denied counsel's request, finding insufficient evidence to support an instruction on involuntary manslaughter. The jury ultimately convicted [petitioner] of second degree murder. [Petitioner] contends the trial court violated his constitutional rights to due process and a jury trial when it refused to instruct on the lesser included offense of involuntary manslaughter.

[¶]...[¶]

In this case, all of the medical witnesses testified that Fernando's injuries were consistent with child abuse. Dr. Rogers opined that Fernando died from multiple blunt injuries consistent with being beaten to death. He found 30 bruises on Fernando's head, neck, arms, and legs. Dr. Alderdice's testimony that Fernando's head had struck a flat surface, the blood evidence, and the extent of Fernando's injuries were all suggestive that Fernando had been slammed repeatedly against the bed. Dr. Vogel opined that even a fall from a two-story building or a car accident without restraints at 30 to 40 miles per hour could most likely not have caused injuries as severe as those inflicted on Fernando while in [petitioner]'s care. Dr. Egbert compared the instrumentality that inflicted Fernando's injuries to a television falling off a bureau and crushing a child's skull. He concluded that the pattern of injuries he observed in Fernando's eyes occurred exclusively in abusive injuries.

[Petitioner] compares this case to *People v. Albritton* (1998) 67 Cal.App.4th 647, in which the Court of Appeal held that guilty verdicts on involuntary manslaughter and child abuse

United States District Court
Northern District of California

resulting in death were not inconsistent. (*Id.* at p. 656.) But the child victim in *Albritton* died of shaken baby syndrome at the hands of the defendant, which the court held could have been caused by the commission of child abuse without due caution and circumspection. (*Ibid.*) Fernando's injuries in this case were caused by much more than mere shaking. The prosecution's evidence showed that Fernando was violently beaten to death. If the jury believed that evidence, it could only conclude that whoever abused Fernando must have known such abuse would likely cause serious injury or death. On the other hand, had the jury believed [petitioner]'s statement's to the police and doctors about how Fernando became injured, it could only have concluded that Fernando died accidentally. The evidence permitted no middle ground: either [petitioner] acted with criminal malice or he committed no crime at all.

Based on the evidence in the record, no instruction on involuntary manslaughter was warranted.

People v. Olivas, slip op. at 24-26.

Respondent argues that "the failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question." See Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000) (quoting Windham v. Merkle, 163 F.3d 1092, 1105-06 (9th Cir. 1998)).  However, "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the general rule." Solis, 219 F.3d at 929 (citing Bashor v. Risley, 730 F.2d at 1240).  Solis suggests that there must be substantial evidence to warrant the instruction on the lesser included offense.  219 F.3d 929-30 (no duty to instruct on voluntary manslaughter as lesser included offense to murder because evidence presented at trial precluded a heat of passion or imperfect self-defense instruction; no duty to instruct on involuntary manslaughter because evidence presented at trial implied malice).  Furthermore, a habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'"  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." Id.

In petitioner's case, the evidence was not substantial to warrant the instruction on the lesser included offense under the Ninth Circuit's decision in Solis.  Under Supreme Court precedent, due process does not require that an instruction be given unless the evidence supports it.  See Hopper

1   v. Evans, 456 U.S. 605, 611 (1982); Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005).

2   As discussed by the state appellate court, the evidence presented at trial indicated that Fernando's

3   injuries were caused by much more than mere shaking.  See supra at 9.  All of the medical

4   witnesses testified that Fernando's injuries, which included 30 bruises to his head, neck, arms, and

5   legs, and retinal hemorrhages, were consistent with child abuse.  Id.  The evidence in the record

6   supported the conclusion that Fernando was "violently beaten to death" rather than unintentionally

7   injured.  Id.

8          Furthermore, even if we assume the trial court erred, petitioner cannot show actual

9   prejudice.  See Brecht, 507 U.S. at 637.  The state court noted that "the evidence permitted no

10  middle ground: either [petitioner] acted with criminal malice or he committed no crime at all."

11  See supra at 20.  Contrary to petitioner's assertion that there was a "dearth" of evidence which

12  forced the jury to "engage in some measure of guesswork as to what truly happened," Pet. Attach.

13  at 8, there was overwhelming evidence presented at trial which indicated violent child abuse.

14  Moreover, the defense presented no evidence other than petitioner's statements to the doctors and

15  police that the injuries were accidental.  In light of all the evidence showing that Fernando's

16  injuries were inflicted with malice and the lack of evidence showing otherwise, it cannot be said

17  that a failure to give an instruction on involuntary manslaughter had a "substantial and injurious

18  effect or influence" on the jury's verdict.  Brecht, 507 U.S. at 637.  Accordingly, the Court is not

19  convinced that the trial court committed an instructional error such that the resulting conviction

20  violated due process.  See Estelle, 502 U.S. at 72.  Petitioner is not entitled to habeas relief on this

21  claim, and it is DENIED as without merit.

22          3.   Ineffective Assistance of Counsel (Claim 3)

23          Petitioner raised several ineffective assistance of counsel claims, but only the following

24  was addressed by the California Court of Appeal in a reasoned opinion: counsel's failure to deliver

25  evidence promised in his opening statement.  The following ineffective counsel claims were

26  summarily denied by the California Supreme Court: (a) failing to investigate "petitioner's case,

27  such as, failing to obtain the police reports from the 2004 false arrest by Dally [sic] City police";

28  (b) "use impeaching information to discredit witnesses"; (c) investigate "petitioner's defense

witnesses" and prepare his defense; (d) "object to prejudicial photographs" of Fernando "taken after an autopsy"; (e) interview "Social worker who was investigating the witnesses"; (f) interview "the doctor"; (g) ask for or hire "a private investigator to assist him in discovery and preparation"; (h) "obtain the grand jury transcripts to prove threats and duress"; (i) "obtain the transcripts from the juvenile court proceedings"; and (j) "allow [petitioner] to testify in his own defense." (Pet. at 17-18.)

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but "effective" assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment claim based on ineffectiveness of counsel, a petitioner first must establish such counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. Id. at 687-88. Second, the petitioner must establish prejudice resulting from his counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

A federal habeas court considering an ineffective assistance claim need not address the prejudice prong of the Strickland test "if the petitioner cannot even establish incompetence under the first prong." Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998). Conversely, the court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Strickland, 466 U.S. at 697.

A "doubly" deferential judicial review applies in analyzing ineffective assistance of counsel claims under 28 U.S.C. § 2254. See Cullen v. Pinholster, 131 S. Ct. 1388, 1410-11 (2011). The rule of Strickland, i.e., that a defense counsel's effectiveness is reviewed with great deference, coupled with AEDPA's deferential standard, results in double deference. See Cheney v. Washington, 614 F.3d 987, 995 (9th Cir. 2010). Put another way, when § 2254(d) applies, "the question is not whether counsel's actions were reasonable[;] [t]he question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington v.

Richter, 131 S. Ct. 770, 788 (2011).  Moreover, because Strickland's standard for assessing

defense counsel's effectiveness is a "general" one, state courts have "greater leeway in reasonably

applying [that] rule," which in turn "translates to a narrower range of decisions that are objectively

unreasonable under AEDPA."  See Cheney, 614 F.3d at 995 (citing Yarborough v. Alvarado, 541

U.S. 652, 664 (2004)).

      a.  Failure to Deliver Evidence

      The California Court of Appeal summarized what occurred at trial with respect to

petitioner's claim that counsel failed to deliver evidence promised in his opening statement:

> During his opening statement, defense counsel told the jury that the defense would not
> contest the nature of Fernando's injuries, but only "the mechanism or causation of those
> injuries." Consistent with [petitioner]'s statements to police and doctors, defense counsel
> told the jurors that it would hear evidence Fernando fell from the bed onto the floor and
> fell face forward into the heater. In addition, counsel promised that the evidence would
> show Esquivel left for work before [petitioner] arrived at her apartment to babysit on the
> night of the incident. She left Fernando alone in the apartment strapped into his high chair
> watching television. When [petitioner] arrived some minutes later, the high chair had
> tipped over and Fernando was on the ground still strapped into the chair and acting
> disoriented.
>
> Defense counsel also explained that [petitioner] never told the police about Fernando's fall
> from the high chair because of his concern that it would get Esquivel in trouble.
> [Petitioner] and Esquivel subsequently had another baby together and child protective
> services held proceedings on Esquivel's fitness to raise the new child in light of
> Fernando's death. Because of its possible effect in those proceedings, [petitioner] did not
> report the high chair fall until later.
>
> In line with this promised evidence, defense counsel told the jury that medical evidence
> would show that a child may suffer an injury, have a "lucid interval" where he appears to
> be fine, and then suffer a subsequent impact that can dramatically aggravate or cause a re-
> bleed, where an initial injury is aggravated, bleeds again, and leads to a subdural
> hematoma.
>
> Although listed on both the prosecution and defense witness lists, Esquivel ultimately
> refused on the advice of her appointed counsel to testify for either the prosecution or
> defense, citing her Fifth Amendment against self-incrimination. As noted earlier,
> [petitioner] did not testify in his own behalf or introduce any evidence. In his closing
> argument, defense counsel argued that [petitioner]'s statements to Dr. Alderdice and
> Detective Cisneros – that Fernando fell off the bed and fell against the heater – were true,
> and made no further reference to Fernando's asserted fall in his high chair.

///

In his closing and rebuttal arguments, the prosecutor pointed out that no evidence of a fall from a high chair had been presented.

People v. Olivas, slip op. at 18-19.

The state appellate court then analyzed defense counsel's conduct and found that he did not render ineffective assistance.

In our view the most relevant cases are *Burnett* and *Stanley*. The defendant in *Burnett* argued that his trial counsel provided ineffective assistance by failing to call the defendant to testify after promising he would in his opening statement. (*Burnett*, *supra*, 110 Cal.App.4th at p. 573.) The Court of Appeal concluded that this was a reasonable tactical decision in light of extensive impeachment evidence that "would only have further antagonized the jurors and the trial court" had defendant testified. (*Id.* at pp. 883-884.) The court stated: "It is not defense counsel's fault that defendant lied to him. Nor is it counsel's fault that he told the jury that he would present evidence which, apparently during the course of the trial, he discovered was a lie. Once the trial court ruled that defendant's credibility could be impeached with even more damaging evidence, there was little point in engaging in a credibility duel which could only disadvantage defendant with the trial court." (*Id.* at pp. 884-885.)

In this case, the theory that Fernando was accidentally injured when he tipped over his high chair could not have been presented without [petitioner]'s testimony at a minimum. We may infer from counsel's statements on the record that he had already conferred with his client when he made his opening statement, and expected him to take the stand. (See *People v. Hines* (1997) 15 Cal.4th 997, 1032 [counsel not ineffective for informing jury during opening statement that defendant would testify given defendant's indication to counsel that he was willing to do so].) Either defense counsel thereafter changed his mind about the advisability of having [petitioner] testify or [petitioner] changed his own mind about testifying. If [petitioner] refused to testify on his own accord, counsel cannot be faulted. If, on the other hand, [petitioner] followed his counsel's recommendation not to testify, counsel's tactical judgment in that regard is subject to scrutiny. But, here, the record on appeal suggests a number of satisfactory explanations for defense counsel's assumed change of position about having [petitioner] testify. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.)

First, by asserting the privilege against self-incrimination, Esquivel made herself unavailable to corroborate [petitioner]'s claim that Fernando had been left unattended in the high chair. Not only would the jury be less likely to believe [petitioner]'s uncorroborated testimony, but such testimony ran the risk of further antagonizing the jury by seemingly to unfairly scapegoat the child's mother. Second, the prosecution introduced compelling testimony from its highly-credentialed experts that even a fall from a high chair combined with the other accidental spills Fernando suffered by [petitioner]'s account could not have caused the type and extent of injuries Fernando suffered. The prosecution was also prepared to offer other evidence in rebuttal that the chair could not have been tipped over by a child of Fernando's size. Defense counsel may have reasonably concluded that [petitioner] risked more loss of credibility by testifying than by not testifying. Third, the

lack of corroboration and likely cogency of the prosecution's rebuttal testimony had to be weighed alongside the considerable risks to which [petitioner] would expose himself by testifying. There was the risk inherent in offering an account of a different accident than he had never previously mentioned to the police or Dr. Alderdice, even when they were begging him at the hospital for any information that might save Fernando's life. In addition, the court was apparently prepared to allow the prosecution to ask [petitioner] whether he had made statements to others denying his paternity of Fernando, and to call rebuttal witnesses if he denied it. Such evidence would have permitted an inference that [petitioner] was less likely to refrain his violent impulses since he believed Fernando was not his child. Finally, [petitioner]'s testimony might have opened the door to evidence from child protective services files opened for [petitioner] and Esquivel's other child of prior incidents of violence, and of altercations between [petitioner] and Fernando's aunts and uncles.

Assuming for the sake of analysis that defense counsel advised [petitioner] not to testify, we cannot say, on this record, that there can be no satisfactory explanation or defensible tactical basis for such an action. To the contrary, such advice reflects a reasonable tactical decision based on the developments that unfolded at trial and the likely disadvantages to [petitioner] of taking the stand to present an uncorroborated version of what occurred on the night in question that had never been furnished to police or to the doctors attempting to save Fernando's life, could not credibly account for Fernando's injuries in any event, and would have exposed [petitioner] to damaging cross-examination and rebuttal evidence.

Finally, as in *Stanley*, even if "counsel's failure to present the witness and testimony described in his opening statement had no tactical justification and fell below the normal range of competency, we would find such error nonprejudicial." (*Stanely*, *supra*, 39 Cal.4th at p. 955.) In our view, the evidence of [petitioner]'s guilt was overwhelming and it is not reasonably likely that any jury would have believed his belated claim that Fernando's high chair tipped over or that he withheld that alleged fact from doctors and police in order to protect Esquivel. We also do not find it reasonably likely that the jury's verdict would have been more favorable to [petitioner] if his counsel had not raised the high chair theory in his opening statement. The story [petitioner] told police was convincingly refuted by the medical testimony and would not have gained any appreciable persuasive force if the high chair claim had never been mentioned to the jury.

Id. at 22-24.

Petitioner's claim is without merit.  Even if we assume that counsel's failure to deliver evidence promised in his opening statement was below professional norms, petitioner cannot show that he was prejudiced by it.  Strickland, 466 U.S. at 697.  As pointed out by the state appellate court, the evidence of child abuse was overwhelming and it was not reasonably likely that any jury would have believed petitioner's story that Fernando's high chair had tipped over.  Furthermore, even if counsel had presented the evidence as promised, it would not likely have rendered a different result because the prosecution presented expert medical testimony showing that even a

fall from a high chair combined with the other accidental spills which petitioner claims Fernando suffered could not account for the full extent and severity of Fernando's injuries.  See supra at 3, 24.  Accordingly, the state courts' rejection of this claim was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.  Petitioner is not entitled to habeas relief on this claim.

### b.   Remaining Sixth Amendment Claims

The following ineffective assistance of counsel claims were summarily denied by the California Supreme Court: (a) failing to investigate "petitioner's case, such as, failing to obtain the police reports from the 2004 false arrest by Dally [sic] City police"; (b) "use impeaching information to discredit witnesses"; (c) investigate "petitioner's defense witnesses" and prepare his defense; (d) "object to prejudicial photographs" of Fernando "taken after an autopsy"; (e) interview "Social worker who was investigating the witnesses"; (f) interview "the doctor"; (g) ask for or hire "a private investigator to assist him in discovery and preparation"; (h) "obtain the grand jury transcripts to prove threats and duress"; (i) "obtain the transcripts from the juvenile court proceedings"; and (j) "allow [petitioner] to testify in his own defense."  Petitioner presents these claims without further clarification, asserting that the cumulative effect of these errors created a "breakdown in [his] Sixth Amendment right."  (Pet. at 17-18.)

A defense attorney has a general duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  See Strickland, 466 U.S. at 691; Cullen v. Pinholster, 131 S. Ct. 1388, 1407 (2011); Turner, 158 F.3d at 456.  Strickland directs that "'a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'"  Silva v. Woodford, 279 F.3d 825, 836 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 491).

With respect to the first claim, Respondent asserts that petitioner's Exhibit D to his state habeas petition before the state high court demonstrates that the police reports from his "2004 false arrest" by the Daly City Police were given to defense counsel.  (Ans. at 26.)  Exhibit D is a letter from the city attorney of Daly City to petitioner in response to his California Public Records Act Request.  (See Docket No. 57.)  The relevancy of these reports is based on petitioner's belief

26

1    that Celia and Alma, Lizbeth Esquivel's sisters, made false statements against him at the time, a

2    fact which could be used to attack their credibility.  However, the testimony of the sisters was

3    relatively minor, and, as such, the value of the impeachment evidence was minimal compared to

4    the harm the use of such evidence, i.e., petitioner's prior arrest, would do to the defense case.

5    Counsel need not pursue an investigation that would be fruitless or might be harmful to the

6    defense.  See Harrington, 131 S. Ct. at 789-90.  Accordingly, counsel was not deficient for failing

7    to pursue this line of investigation.

8         Petitioner's claims that counsel failed to: "use impeaching information to discredit

9    witnesses"; investigate "petitioner's defense witnesses" and prepare his defense; interview "Social

10   worker who was investigating the witnesses"; interview "the doctor"; ask for or hire "a private

11   investigator to assist him in discovery and preparation"; "obtain the grand jury transcripts to prove

12   threats and duress"; and "obtain the transcripts from the juvenile court proceedings."  However,

13   petitioner provides no facts in support of these claims.  For example, he does not identify the

14   witnesses mentioned in these claims, nor the "Social worker" or the "doctor."  Nor does petitioner

15   explain why a private investigator was necessary to assist counsel in preparing his case and why

16   the lack of one rendered counsel's performance deficient.  Petitioner does not identify which grand

17   jury proceedings he needs the transcript of, what "threats and duress" needed to be proven or how

18   they are relevant to his case.  Lastly, petitioner does not explain which juvenile court proceedings

19   he is referencing or why the transcripts thereto are relevant.  Petitioner makes no attempt to clarify

20   these claims in his traverse.  Accordingly, these claims fail to state a claim upon which relief may

21   be granted.

22        Petitioner's claim that counsel failed to investigate witnesses and prepare a defense is also

23   unsupported by facts.  As discussed above in petitioner's first ineffective counsel claim, counsel

24   did prepare a defense which he was forced to abandon due to changed circumstances, i.e., when

25   Esquivel decided not to testify at trial.  See supra at 23.  The United States Supreme Court has

26   never required defense counsel to pursue every nonfrivolous claim or defense, regardless of its

27   merit, viability, or realistic chance of success.  Knowles v. Mirzayance, 556 U.S. 111, 125, 127

28   (2009).  Thus counsel's abandoning a defense that has "almost no chance of success" is

United States District Court
Northern District of California

27

1    reasonable, even if there is "nothing to lose" by preserving the defense.  Id. at 1419-20.  Counsel

2    has wide discretion in making tactical decisions, including abandoning inconsistent or

3    unsupported defenses, see Knowles, 556 U.S at 123-125; Correll v. Stewart, 137 F.3d 1404, 1411-

4    12 (9th Cir. 1998).  Furthermore, the duty to investigate and prepare a defense does not require

5    that every conceivable witness be interviewed.  Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th

6    Cir. 1995).  When the record shows that the lawyer was well-informed, as he was here in

7    petitioner's case, and the defendant fails to state what additional information would be gained by

8    the discovery he now claims was necessary, an ineffective assistance claim fails.  Eggleston v.

9    United States, 798 F.2d 374, 376 (9th Cir. 1986).

10           Petitioner claims that counsel was ineffective for failing to object to prejudicial

11   photographs of Fernando taken after an autopsy.  Respondent asserts that it was possible that

12   counsel did not object because he either felt that such objection was futile or he did not want to

13   risk calling more attention to such photographs by objecting.  (Ans. at 27.)  When § 2254(d)

14   applies, "the question is not whether counsel's actions were reasonable.  The question is whether

15   there is any reasonable argument that counsel satisfied Strickland's deferential standard."

16   Harrington, 131 S. Ct. at 788.  Furthermore, a lawyer need not file a motion that he knows to be

17   meritless on the facts and the law.  Put simply, trial counsel cannot have been ineffective for

18   failing to raise a meritless motion.  Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005).

19   Because the extent of Fernando's injuries was highly relevant as to causation, it was not likely that

20   a motion to suppress the photos at issue would have been granted.  In addition, the evidence

21   against petitioner was overwhelming such that even had the photos been suppressed, petitioner

22   was not likely to have received a different result.  Accordingly, this claim is without merit.

23   Lastly, petitioner claims that counsel was ineffective for not allowing him to testify in his own

24   defense.  As discussed above, the state appellate court found that the record suggested a number of

25   satisfactory explanations for counsel's assumed change of position about having petitioner testify.

26   See supra at 24-25.  The court reasonably concluded that it was a reasonable tactical decision for

27   petitioner not to testify at trial because it would expose him to damaging cross-examination and

28   rebuttal evidence.  Id.; see e.g., Matylinsky v. Budge, 577 F.3d 1083, 1097-98 (9th Cir. 2009)

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

(defendant not prejudiced by counsel's advice not to testify at trial where his testimony would not have assisted his case but rather would have subjected defendant to damning cross-examination on prior convictions).  Moreover, "the *Strickland* standard is applicable when a petitioner claims his attorney was ineffective by denying him his constitutional right to testify. *Medley v. Runnels,* 506 F.3d 857, 861 (9th Cir.2007)."  Id. at 1097.  Petitioner has failed to demonstrate prejudice.  He gives no indication of how his testimony, if presented, would have assisted his case.  Accordingly, petitioner is not entitled to federal habeas relief on this claim.

c.   <u>Newly Exhausted Ineffective Counsel Claims</u>

Petitioner exhausted the following additional ineffective counsel claims which were included in this action in a supplemental pleading: (1) counsel failed to seek immunity for Lizbeth Esquivel and compel her to testify; (2) counsel refused "petitioner's repeated requests" to testify, and threatened petitioner "with going to prison if he testified"; (3) counsel failed to employ an investigator; and (4) counsel failed to "enter the Grand Jury transcripts" of Lizbeth Esquivel's testimony.  (See Docket No. 18.)  The state courts summarily denied these claims on habeas.  (Ans. Exs. 19, 20.)  Claims 2 and 3 are identical to claims raised in the original petition and are without merit for the reasons discussed above.  See <u>supra</u> at 27-28.  Petitioner's claims regarding Lizbeth Esquivel remain and are addressed below.

According to the record, Esquivel testified before the grand jury on June 1, 2005.  (Ans. Ex. 1A at 123-189.)  She stated that the day before his death, Fernando fell in the bathtub and hit his head on the faucet.  (Id. at 147.)  As a result of the fall, Fernando had "just a mark," which Esquivel described as "nothing"; otherwise, there was no bleeding or bruising, and he seemed fine the next day.  (Id. at 147, 149-150, 158, 170.)  Other than this mark and the remnants of an insect bite, Fernando did not have any other marks or bruises when Esquivel left him with petitioner the next day.  (Id. at 147-148, 170.)  She had no explanation for the bruises on Fernando's face and head at the time of his death.  (Id. at 170.)

On August 6, 2007, Esquivel appeared before the court on the first day of testimony in petitioner's trial.  Petitioner's counsel had spoken to Esquivel about the possibility of having

29

independent counsel represent her.  (Ans. Ex. 6D at 116.)  The court appointed an attorney to represent her upon Esquivel's request.  (Id. at 116-117.)  Esquivel was going to testify that Fernando experienced a previously undisclosed fall from a high chair.  (Id. at 117, 148-149.)  The prosecutor served her with a subpoena duces tecum, which compelled production of the high chair.  (Id. at 117.)

After a review of Esquivel's grand jury testimony and his discussions with her, counsel advised Esquivel to invoke her Fifth Amendment privilege which she did.  (Id. at 213-216.)  Counsel was concerned about potential perjury charges should Esquivel's testimony at trial differ from her grand jury testimony as well as child endangerment charges.  (Id. at 209-210, 217.)  The prosecutor agreed that if Esquivel changed her testimony from what she gave before the grand jury, she would incur criminal liability for perjury.  Petitioner's trial counsel also agreed.  (Id. at 211, 216-217.)  The prosecutor advised Esquivel's counsel that he would consider extending an offer of immunity to Esquivel.  (Id. at 218.)  With the possibility that Esquivel would not be available to testify, petitioner's trial counsel remarked that he did not need Esquivel's testimony because he "was anticipating that we will hear from Mr. Olivas" on the issue of why he did not mention the high chair fall earlier.  (Id. at 340.)

The next day, the prosecutor advised the court that he had informed Esquivel's counsel that the statute of limitations had run on child endangerment but not perjury.  (Ans. Ex. 6E at 347.)  He also told the court that counsel's advice to Esquivel remained the same and that her decision to invoke her right to not incriminate herself would not change.  (Id. at 349.)  The prosecution was still considering whether to offer immunity to Esquivel.  (Id. at 349-350.)  The prosecutor further stated to the court:

> Having said that, I did acquiesce in [Esquivel's] indication yesterday that she would take the 5th and say that there's good faith basis for it, the reason for this is, I understand that her testimony would contradict what she said to the Grand Jury and in a case such as this with a dead baby, if a witness lied at the Grand Jury on a material point that might have affected the Grand Jury outcome, that might affect the outcome of a trial later, and that certainly would influence the way in which we proceeded after the Grand Jury, if all of that were true then it would be the sort of [] case that one might refer for perjury prosecution.
>
> So that's where we stand and that is why the witness was – the witness would properly

advise us to her liability, and I have not done anything to interfere in any fashion with the witness. And I have a good faith basis to agree with [counsel for Esquivel] that she does, in fact, have some criminal exposure if she were to testify today, materially differently than she had in front of the Grand Jury….

(Ans. Ex. 6E at 348-349.)

///

Petitioner's trial counsel responded in part:

There are other issues regarding whether or not the witness will, in fact, become unavailable and whether or not any prior statements are admissible. The problem is that there are – there [are] some prior recorded statements under oath. I don't believe that I would be seeking to introduce those, but I'll have to evaluate that situation, that would be the Grand Jury testimony. There are other statements that she has made that were not under oath and I don't think with all candor that they meet the criteria as prior recorded testimony and for the purposes of admission without her testifying.

The other thing I would comment on and I think the law is such that I cannot, and do not have the ability to compel the People to confer immunity nor can I compel the Court to direct the People to confer immunity upon a witness, but it would appear very likely that but for a grant of immunity from the People that she will be, in fact, unavailable. And there is one very narrow issue that I previously articulated to the Court in terms of what I was looking for from Ms. Esquivel.

(Ans. Ex. 6E at 350-351.)

Petitioner's claim that counsel was ineffective for failing to seek immunity for Esquivel and compel her to testify is without merit.  The record shows that the prosecution was considering offering immunity to Esquivel, but whether or not he did so was not within defense counsel's ability to control.  Furthermore, petitioner has failed to show that counsel could have compelled either the prosecution or the court to grant immunity to Esquivel.  Rather, there is no law in California that gives a criminal defendant the right to compulsory prosecutorial immunity for witnesses whom he or she wishes to call, see In re Williams, 7 Cal.4th 572, 609 (1994), a fact which counsel was clearly well aware of as indicated by his statement to the court.  (Ans. Ex. 6E at 350-351.)  Accordingly, it cannot be said that counsel's failure to obtain immunity for Esquivel fell below an "objective standard of reasonableness" under prevailing professional norms, particularly as there was no legal authority by which he could do so.  Strickland, 466 U.S. at 687-88.

United States District Court
Northern District of California

31

1    Secondly, petitioner cannot show that he was prejudiced by counsel's conduct, i.e., that

2    "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

3    proceeding would have been different." Strickland, 466 U.S. at 694. Even if Esquivel had been

4    granted immunity and testified at trial, her testimony regarding the high chair fall and Fernando's

5    fall in the bathtub was not likely to have changed the jury's verdict. As discussed previously in

6    petitioner's first ineffective counsel claim, the prosecution presented overwhelming expert

7    medical testimony indicating that Fernando's injuries were intentionally inflicted, and that even a

8    fall from a high chair combined with the other accidental spills could not account for the full

9    extent and severity of Fernando's injuries. See supra at 25.

10    Petitioner's remaining claim that counsel was ineffective for failing to enter transcripts of

11    Esquivel's grand jury testimony into evidence is also without merit because petitioner cannot

12    show prejudice regardless of whether his counsel's performance was deficient. Strickland, 466

13    U.S. at 697. Her testimony that Fernando had fallen in the bathtub and hit his head on the faucet

14    the day before his death was not likely to have changed the result of the proceeding because even

15    Esquivel herself stated that the resulting injury left a mark that was "nothing." Id. at 29. There

16    was no bleeding and he had no other marks or bruises on his body. Id. Esquivel also had no

17    explanation for the bruises on Fernando's body at the time of his death. Id. Furthermore,

18    Esquivel's grand jury testimony included admissions that she had lied to the police in an effort to

19    protect petitioner. (Ans. Ex. 1A at 151-154, 248-250.) Therefore it appears more likely that her

20    testimony would have been more harmful than exculpatory, and not likely to have changed the

21    jury's verdict. Accordingly, the state courts' rejection of this claim was not contrary to, or

22    involved an unreasonable application of, clearly established Supreme Court precedent. Petitioner

23    is not entitled to habeas relief on this claim.

24         d.   Cumulative Impact

25    "'[P]rejudice may result from the cumulative impact of multiple deficiencies.'" Harris v.

26    Wood, 64 F.3d 1432, 1438 (9th Cir. 1995) (quoting Cooper v. Fitzharris, 586 F.2d 1325, 1333 (9th

27    Cir. 1978) (en banc), cert. denied, 440 U.S. 974 (1979)). In other words, in a case with various

28    deficiencies, there may be a reasonable probability that, absent the various deficiencies, the

United States District Court
Northern District of California

outcome of the trial might well have been different. This is not the case here. Petitioner has failed to show that counsel was deficient based on any of the claims he raises in the petition. Accordingly, there was no prejudice based on cumulative impact.

### 4.    Withholding Evidence (Claim 4)

Petitioner claims that the prosecutor withheld information that could have been used to impeach two prosecution witnesses, Celia and Alma Esquivel, Lizbeth Esquivel's sisters. Specifically, petitioner claims that in 2004, Celia and Alma brought false criminal charges against petitioner for making terrorist threats which were dismissed as not true. (Pet. at 9.) Petitioner asserts that the prosecutor's failure to turn over this "critical impeachment evidence" violated Brady v. Maryland, 373 U.S. 83 (1963), because these witnesses were also responsible for mistreating Fernando. Id. The California Supreme Court summarily dismissed this claim on habeas corpus.

In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. The Supreme Court has since made clear that the duty to disclose such evidence applies even when there has been no request by the accused, United States v. Agurs, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, United States v. Bagley, 473 U.S. 667, 676 (1985). Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Cone v. Bell, 556 U.S. 449, 469-70 (2009). "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine confidence in the outcome of the trial.'" Smith v. Cain, 132 S. Ct. 627, 630 (2012) (quoting Kales v. Whitley, 514 U.S. 419, 434 (1995)). "[E]vidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." Smith, 132 S. Ct. at 630-31 (finding impeachment evidence of prosecution's sole witness material); accord Agurs, 427 U.S. at 112-13 & n. 21.

1    In sum, for a Brady claim to succeed, (1) the evidence at issue must be favorable to the

2    accused, either because it is exculpatory or impeaching; (2) that evidence must have been

3    suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice[10] must have

4    ensued.  Banks v. Dretke, 540 U.S. 668, 691 (2004); Strickler v. Greene, 527 U.S. 263, 281-82

5    (1999); cf. Towery v. Schriro, 641 F.3d 300, 309-10 (9th Cir. 2010) (no habeas relief on Brady

6    claim under § 2254 where state court reasonably determined "beyond a reasonable doubt that the

7    prosecutor's misconduct did not affect the verdict").

8    Assuming that this evidence was favorable to petitioner, petitioner's own evidence

9    demonstrates that the police reports from the 2004 arrest by the Daly City Police were given to

10    defense counsel as discussed previously in one of petitioner's ineffective counsel claims.  See

11    supra at 26.  Accordingly, it cannot be said that such evidence was willfully suppressed by the

12    prosecution.  Furthermore, even if the documents had not been provided to petitioner, petitioner

13    has failed to show that the evidence was material, i.e., that there was a reasonable probability that

14    the result of the proceeding would have been different had the evidence been provided.  Cone v.

15    Bell, 556 U.S at 469-70.  The prosecution's case was primarily based on medical evidence which

16    was overwhelming and contradicted petitioner's version of events.  Therefore, it cannot be said

17    that any evidence impeaching Celia and Alma Esquivel was material where there was

18    overwhelming evidence against petitioner that was "strong enough to sustain confidence in the

19    verdict."  Smith, 132 S. Ct. at 630-31.  Accordingly, there was no Brady violation.  Petitioner is

20    not entitled to federal habeas relief on this claim.

21    5.    Prosecutorial Misconduct (Claims 5 & 6)

22    Petitioner claims that the prosecutor committed misconduct (a) in handling evidence of the

23    infant victim's prior head injuries, and (b) by intimidating a defense witness.

24        a.    Handling of Evidence

25    Petitioner claims that the prosecution presented a "false and/or misleading set of

26    evidence… by failing to provide the Jury, Doctors, and Expert Witnesses with the testimony given

27

28    ───────────────
[10]For the purpose of Brady, the terms "material" and "prejudicial" have the same meaning.  United
States v. Kohring, 637 F.3d 895, 902 n.1 (9th Cir. 2011).

United States District Court
Northern District of California

1   by Ms. Esquivel, indicating that the infant Fernando had suffered a number of previous serious

2   head injuries; and fell in the shower the day before his death striking his head on the metal faucet."

3   (Suppl. to Pet. at 28.)

4          There are three situations in which a violation of the prosecutor's duty to disclose

5   information may occur: (1) where the prosecutor uses testimony which he knows or should know

6   is perjured or false; (2) where defendant requests specific evidence which is not provided; and (3)

7   where the defense makes a general request or no request at all and prosecutor fails to provide

8   information which might create a reasonable doubt.  See  United States v. Agurs, 427 U.S. 97,

9   103-07 (1976).  Due process is also violated when the prosecutor, although not soliciting false

10  evidence, allows it to go uncorrected when it appears.  Napue v. Illinois, 360 U.S. 264, 269

11  (1959); cf. United States v. Alli, 344 F.3d 1002, 1006-08 (9th Cir. 2003).

12         In sum, to prevail on a claim based on Agurs/Napue, the petitioner "must show 'that (1)

13  the testimony (or evidence) was actually false, (2) the prosecution knew or should have known

14  that the testimony was actually false, and (3) . . . the false testimony was material.'" Hayes v.

15  Brown, 399 F.3d 972, 984 (quoting United States v. Zuno-Arce, 339 F.3d 8 86, 889 (9th Cir.

16  2003)); see Schad v. Ryan, 671 F.3d 708, 717 (9th Cir. 2011) (per curiam) (finding no

17  prosecutorial misconduct where it was not entirely clear that prosecution witness had lied or,

18  assuming he did, that the state knew or should have known that his testimony was false).

19  "Material" means that there is a reasonable likelihood that the false evidence or testimony could

20  have affected the judgment of the jury.  Morris v. Ylst, 447 F.3d 735, 743 (9th Cir. 2006); see

21  Jones v. Ryan, No. 10-99006, slip op. 9373, 9395-96 (9th Cir. Aug. 16, 2012) (false impression

22  allegedly created by sketches not material because there was overwhelming evidence of guilt

23  unrelated to sketches).

24         Petitioner's claim fails because the information at issue, i.e., that Fernando had suffered a

25  bathtub fall the day before his death, was not information that would have created reasonable

26  doubt.  Neither can it be said that such information was "material" because there was no

27  reasonable likelihood that it could have affected the judgment of the jury.  As discussed several

28  times previously, there was overwhelming evidence presented by medical experts that Fernando's

United States District Court
Northern District of California

35

United States District Court
Northern District of California

1  injuries were caused by intentional force.  Fernando's autopsy revealed that he had injuries over a

2  wide area of his body, which was significantly more than just a "mark" on his head from a fall in

3  the bathtub.  See supra at 5.  The forensic pathologist opined that Fernando died "from 'multiple

4  blunt injuries,' consistent with being beaten to death."  Id.  There were 19 bruises on Fernando's

5  head and neck and 11 bruises on his arms legs which appeared to have inflicted between 7:00 p.m.

6  on April 8 and 1:00 a.m. on April 9, during the time petitioner was with Fernando.  Id.   The

7  neuropathologist opined that a subdural hematoma in Fernando's brain was the result of the

8  infliction of traumatic injury, and that multiple severe hemorrhages in front of and behind

9  Fernando's retinas were indicative of blunt force trauma.  Id.  He further concluded that it would

10  be a "stretch" to attribute such severe injuries even "to a fall from a two story building or a car

11  accident without restraints at 30 to 40 miles per hour."  Id.  Finally, an expert in ophthalmic

12  pathology concluded that the pattern of injuries he observed in Fernando's eyes occurs exclusively

13  in abusive injuries, and that no explanation other than child abuse could account for Fernando's

14  retinal hemorrhages.  Id.  In light of the extensive evidence indicating that Fernando sustained

15  multiple injuries over a wide area and that the injuries were intentionally inflicted, it is not likely

16  that information that one "mark" on his head caused by a fall in the bathtub would have changed

17  the expert witnesses' opinions or the jury's verdict.  In conclusion, the fact that Fernando had a

18  minor slip and fall in the bathtub the day before was not material evidence in light of the

19  overwhelming evidence of petitioner's guilt.  Ylst, 447 F.3d at 743.  The state courts' rejection of

20  this claim was not contrary to, or involved an unreasonable application of, clearly established

21  Supreme Court precedent.  Petitioner is not entitled to habeas relief on this claim.

22                          b.      Intimidating a Witness

23          Petitioner's final claim is that the prosecutor committed misconduct by threatening to

24  charge Esquivel with murder if she testified for the defense which caused her to plead the Fifth.

25  (Suppl. to Pet. at 34.)

26          As an initial matter, Petitioner has presented no evidence that the prosecutor ever

27  threatened to charge Esquivel with murder.  That alone is reason to deny relief on this claim.

28          The only event in the record that bears even a passing resemblance to such a claim is that

the prosecutor did discuss the question of whether Esquivel might be liable for perjury.  As to that

event, there is no evidence of prosecutorial impropriety.  Respondent cites the discussion with the

trial court and the petitioner's trial counsel on the potential unavailability of Esquivel, during

which the prosecutor stated:

> I think it's important to say that I have not threatened, conveyed threats, discussed, suggested or otherwise passed on the possibility of any perjury prosecution. There's been no attempt to interfere with the witness on the defense witness list, in fact, in my office and in most professional offices you don't file perjury charges on your own case because it could appear or might even be true that you're trying to prosecute somebody because you don't like what they said because you're unhappy that they messed up your case.

(Ans. Ex. 6E at 348.)

Respondent also points out that Esquivel was a potential witness for the prosecution as

well as the defense.  (Suppl. to Ans. at 11; Ans. Ex. 1B at CT 359.)  The prosecutor anticipated

that Esquivel would testify that Fernando did not have any injuries at the time she left him with

petitioner the day of his death, which was persuasive evidence for the prosecution's case.  Her

favorable testimony on this point was likely why the prosecution was considering offering

immunity to Esquivel.  However, it appears that the prosecution decided their case was strong

enough without Esquivel's testimony.

An unnecessarily strong admonition against perjury aimed at discouraging a defense

witness from testifying may deprive a criminal defendant of his Sixth Amendment right to

compulsory process.  See United States v. Vavages, 151 F.3d 1185, 1188 (9th Cir. 1998).  Perjury

warnings from a judge or prosecutor are not improper per se, but a defendant's Sixth Amendment

rights are implicated by coercive or intimidating language or tactics that substantially interfere

with a defense witness' decision to testify.  See id. at 1189.  The "substantial interference" inquiry

is extremely fact-specific; among the factors that may be considered are the manner in which the

judge or prosecutor raises the issue, the language of the warnings, and the prosecutor's or judge's

basis in the record for believing the witness might lie.  See id. at 1190.  If the substance of the

communication is a threat over and above what is necessary and appropriate, the inference of

coercion is strong.  See id.; see also Webb v. Texas, 409 U.S. 95, 97-98 (1972) (government may

not substantially interfere with testimony of defense witnesses).

United States District Court
Northern District of California

Petitioner's claim here is without merit. The record shows that it was Esquivel's attorney who first saw the possibility of perjury charges and advised her to plead the Fifth. See supra at 29. After reviewing the matter, the prosecution advised Esquivel's counsel that although the statute of limitations had expired on child endangerment, prosecution for perjury was still possible. Id. The prosecution also discussed the matter in court with all interested parties, and agreed that Esquivel had a good faith basis for invoking her Fifth Amendment right not to testify. Id. at 30. The prosecution stated that he had "not done anything to interfere in any fashion with the witness." Id. The record reveals no coercive or intimidating language by the prosecutor or the court which substantially interfered with Esquivel's decision to testify. In fact, no formal warnings were issued on the matter of perjury because Esquivel's own attorney raised the matter and advised his client not to testify. At most, the prosecution "acquiesced" that Esquivel had a good faith reason for invoking the Fifth Amendment. Petitioner fails to present evidence otherwise, either in the record or outside of it. Accordingly, there was no misconduct by the prosecution with respect to Esquivel's decision not to testify at trial. The state courts' rejection of this claim was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent. Petitioner is not entitled to habeas relief on this claim.

C.     Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. See Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. Id. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of

appealability will be denied.

## IV.  CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED**.

Dated: June 20, 2013

_____
JON S. TIGAR
United States District Judge

G:\PRO-SE\JST\HC.11\11-499.dny.hc.hhl.docx

United States District Court
Northern District of California